IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPHINE CARNEY | : | CIVIL ACTION |
| v. | : | |
| HEALTHCARE SERVICES GROUP, INC. | : | NO. 09-cv-4100-JF |

ADJUDICATION

Fullam, Sr. J.                                                                      May 18, 2010

After a two-day, non-jury trial in this retaliation case, I now set forth, in narrative form, my findings of fact and conclusions of law.

The defendant, Healthcare Services Group, Inc., is a Pennsylvania corporation that provides housekeeping, laundry, maintenance, and food services to healthcare institutions on a contract basis. The plaintiff, Josephine Carney, was hired by Healthcare Services Group in April 2002 as a full-time housekeeper. She was employed in that position until her termination in January 2008.

The issue to be decided in this case is whether the plaintiff was terminated in retaliation for having made complaints about sexual harassment and pregnancy discrimination to her supervisors and the Equal Employment Opportunity Commission and for having filed a federal lawsuit, which the parties settled in 2008.

From 2002 until 2007, the plaintiff was assigned to work at the Silver Lake Center, a skilled nursing facility in Bristol, Pennsylvania.  At trial, various employees testified that the plaintiff was regarded as a challenging and combative employee by her supervisors and co-workers.  However, the plaintiff's personnel record does not reflect any instances of discipline during her first four years of employment, and none of the witnesses testified with any specificity in this regard. Further, the testimony conflicts with a written performance evaluation given to the plaintiff in early 2004 by her immediate supervisor, and the Account Manager at the Silver Lake facility, Kevin O'Connor.  Mr. O'Connor identified the plaintiff as an overall "good" employee, whose performance was "satisfactory" in the area of "cooperation."  This was the only written performance evaluation ever given to the plaintiff.

In mid-2006, the plaintiff began having a sexual relationship with Ronald Felder, who, at that time, had recently been hired to replace Mr. O'Connor as the Account Manager at the Silver Lake facility.  The relationship occurred during and after working hours, and the plaintiff ended the relationship when she learned that Mr. Felder was married.

The plaintiff testified credibly that after she ended the relationship, Mr. Felder began harassing her.  The harassment included assigning the plaintiff difficult work that was outside

2

of her job description and pressuring her to resume the sexual relationship. The harassment worsened after Mr. Felder learned that the plaintiff was expecting a child with another man, although he no longer attempted to pursue a sexual relationship with her.

The plaintiff complained about the harassment to Mr. Felder and threatened to file a claim with the Equal Employment Opportunity Commission. She also complained to William Kauffman, the Regional Manager of the Silver Lake facility,[1] and Charles "Chuck" Batdorf, the District Manager of the facility.[2]

In November 2006, Mr. Batdorf offered to transfer the plaintiff to a part-time position at D'Youville Manor in Yardley, Pennsylvania. The transfer was motivated by the plaintiff's complaints and by a possible vacancy in the Account Manager position at D'Youville Manor. Mr. Batdorf told the plaintiff that he was considering her for a promotion to the Account Manager position. The plaintiff accepted the part-time position,

---

[1] Mr. Kauffman has been the Regional Manager responsible for the Silver Lake, Manor Care, and D'Youville Manor facilities, among others, since January 2006. He was the District Manager responsible for those facilities from 2004 until December 2005. The plaintiff testified that she disclosed the sexual nature of her relationship with Mr. Felder to Mr. Kauffman, however, Mr. Kauffman did not recall hearing any complaints of sexual harassment, only general harassment, at that time.

[2] Mr. Batdorf was the District Manager responsible for the Silver Lake, Manor Care, and D'Youville Manor facilities from January 2006 until September 2007. The plaintiff testified that she only complained of general harassment, not sexual harassment, to Mr. Batdorf.

3

and during November and December 2006, the plaintiff worked two days a week at D'Youville Manor and three days a week at Silver Lake.

The Account Manager position never became available, and the plaintiff was transferred, at her request, back to a full-time position at Silver Lake. Mr. Felder, who was still employed as the Account Manager at Silver Lake in January 2007, issued three written employee warning notices to the plaintiff on January 2, 2007, January 30, 2007, and February 6, 2007, for her failure to maintain a professional and cooperative attitude and poor job performance. The plaintiff understood the notices to be further harassment, and on January 30, 2007, the plaintiff filed a complaint with the EEOC alleging sexual harassment and pregnancy discrimination.

On March 5, 2007, Mr. Kauffman permanently transferred the plaintiff from the Silver Lake facility to Manor Care in Yardley, Pennsylvania. The plaintiff initially requested the transfer, but later asked to remain at Silver Lake, because, in her view, she had not done anything wrong, and Mr. Felder should have been transferred away from Silver Lake. The plaintiff wrote to the defendant's Human Resources Department to complain about the transfer.[3]

---

[3]In the defendant's proposed findings of fact, it is asserted that neither Mr. Kauffman nor Mr. Batdorf was aware of the plaintiff's EEOC charge until after she had been transferred to Manor Care in mid-March of 2007, however, this conflicts with

4

In response, in mid-March of 2007, Timothy McCartney, the defendant's in-house counsel, who also performed human resources functions for the company, contacted the plaintiff to discuss the letter and the EEOC complaint. The plaintiff testified that Mr. McCartney promised to investigate her complaint and said that he would "be in touch," but she never heard from him or from anyone else. Mr. Felder voluntarily resigned from Healthcare Services Group in mid-2007.

While at Manor Care, the plaintiff was supervised by Account Manager Brian Cunningham, who has since died, and Assistant Account Manager Linda Kolk. The plaintiff's personnel record does not reflect any instances of discipline while at Manor Care in 2007.[4] A former employee of Healthcare Services Group, Kristen Drenkhahn, testified that the plaintiff was treated differently than the other employees at Manor Care, and that she had been warned not to talk to the plaintiff by Mr. Cunningham because the plaintiff was "trouble." Another co-worker, Johnny Williams, testified similarly at trial. The

---

defendant's position statement submitted to the EEOC, which states that the plaintiff's attorney sent a letter to the defendant in February 2007 notifying the defendant of the EEOC charge, and, at this point, Mr. Batdorf and Mr. Kauffman became aware of the plaintiff's sexual relationship with Mr. Felder.

[4] Mr. Batdorf, who was the District Manager of Manor Care until September 2007, testified that he knew of no instances of discipline of the plaintiff by Mr. Cunningham. Mr. Kauffman testified that the plaintiff was given several oral reprimands by Mr. Cunningham, however, Mr. Kauffman could not recall any details of these reprimands and their existence was not corroborated.

5

defendants concede that Mr. Cunningham and employees at the Manor Care facility were made aware of the plaintiff's "legal issues" and alleged disciplinary problems.

On January 4, 2008, the plaintiff filed the federal lawsuit asserting sexual harassment and pregnancy discrimination claims against the defendant. The following day, the plaintiff was involved in an altercation with the aforementioned co-worker, Mr. Williams. The plaintiff was eating lunch in the facility's employee break room when she and Marilyn Lopez, a food service manager at the facility employed by another company, heard shouting and loud music coming from the laundry room. Ms. Lopez directed the plaintiff to go to the laundry room to investigate.

The plaintiff went to the laundry room, where Mr. Williams was working, tapped him on the shoulder, and told him to turn the music down. Mr. Williams testified that he misunderstood the plaintiff; he shouted and cursed at her, and physically threatened her.[5] Later that day, the plaintiff and Mr. Williams apologized to each other for the misunderstanding. Neither the plaintiff nor Mr. Williams was disciplined for the altercation during the rest of the work shift on Saturday,

---

[5] In a written statement regarding the incident, Mr. Williams stated that the plaintiff had pushed him. At trial, Mr. Williams testified that he had exaggerated in his written statement because he didn't want to get in trouble and that the plaintiff had only "nudged" him to get his attention.

6

January 5, 2008, or during their shift on Sunday, January 6, 2008.

On January 7, 2008, Mr. McCartney received an email from outside counsel notifying him that the plaintiff had filed a federal lawsuit. At approximately 2:45 p.m. that day, just before the end of the plaintiff's shift, Mr. Cunningham requested that the plaintiff prepare a written statement regarding the altercation with Mr. Williams. The plaintiff testified that Mr. Cunningham told her that he needed the statement for the "lawyers." Mr. Williams was also required to prepare a statement.

The plaintiff worked on January 8, 2008. On January 9, 2008, at the end of the plaintiff's scheduled shift, Mr. Cunningham notified the plaintiff that she was being indefinitely suspended, and that he would not know whether she could come back to work until after he had talked to the "lawyers."

The next day, the plaintiff was informed by Ms. Drenkhahn that Mr. Williams was at work and that he had not been suspended for the altercation.[6] The plaintiff called Mr. Cunningham and complained that she was being treated unfairly. Mr. Williams testified that later that day, on January 10, 2008,

---

[6] At trial, the defendant produced for the first time Mr. Williams' time card which reflected that his last day of work was January 9, 2008, the same day as the plaintiff's. However, the time card conflicts with the defendant's payroll records which reflect that Mr. Williams was inexplicably paid for an additional day of work in the next pay period.

7

he was indefinitely suspended.  Mr. Cunningham told Mr. Williams that he was forced to suspend him, so that the plaintiff could be terminated, and it was possible that he could be reinstated in the future.  Twenty days after the plaintiff was suspended, the defendant notified her that she was being terminated.

To succeed with her retaliation claim, the plaintiff must show that she suffered a materially adverse employment action that was taken in retaliation for engaging in protected conduct.  The parties do not dispute that the plaintiff engaged in protected conduct or that termination from employment constitutes a materially adverse employment action.  The question for the Court is whether the plaintiff has established a causal connection between the protected conduct and her termination.  I readily conclude that she has.

Although the defendant contends that the plaintiff was a "problem" employee, the facts, when considered collectively, do not support that conclusion.  The plaintiff received a good performance review, was considered for a promotion by Mr. Batdorf, and incurred no written discipline (except for the three employee warning notices given by Mr. Felder, which, in themselves, I find to be retaliatory).

The timing of the plaintiff's termination is also strongly suggestive of retaliation.  Neither the plaintiff nor Mr. Williams was disciplined for their altercation by Assistant Account Manager Linda Kolk, who was present at the facility at

8

the time.  They were required to prepare written statements about the altercation the same day that Mr. McCartney received notice of the plaintiff's federal lawsuit.

Finally, Ms. Drenkhahn's testimony, which was corroborated by Mr. Williams, suggests that the plaintiff was treated differently than other employees, and supports the conclusion that the plaintiff was subject to a pattern of antagonism by the defendant after making complaints to her supervisors and the EEOC.

Having determined that the defendant retaliated against the plaintiff in violation of Title VII, I now turn to the appropriate amount of damages.  The plaintiff seeks compensation for one year of lost wages and emotional distress.

At the time of her termination, the plaintiff was a full-time employee earning $9.69 per hour, approximately $20,000 per year.  The plaintiff testified that she made reasonable efforts to find new employment, including enrolling in the employment assistance program, "Career Link," but that she did not obtain a position until January 9, 2009, exactly one year later.  The defendants did not rebut this testimony. Accordingly, the plaintiff will be awarded $20,000 in back pay for the one year that she was without employment.

The plaintiff also seeks compensation for emotional distress.  The plaintiff testified that following her termination she was unable to pay her bills, and her mother was forced to

move in with her to provide financial assistance.  She lost friends and suffered from depression.  There was evidence that the defendant, as part of its "investigation," collected scurrilous statements from various Silver Lake employees, who used the opportunity to comment upon the plaintiff's character, despite their admitted lack of first-hand knowledge.  I conclude that $20,000 shall be awarded to the plaintiff as compensation for her emotional distress.

In addition, the plaintiff is entitled to recover attorney's fees, in an amount to be determined at a later date.

Judgment will be entered accordingly.


BY THE COURT:


/s/ John P. Fullam
John P. Fullam,  Sr. J.